UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:

PAUL EMERSON MCCAULLEY and
JEANINE MARIE MCCAULLEY,

        Debtors.
_____/

Case No. 11-58625-wsd
Chapter 7
Hon. Walter Shapero

## OPINION ON MOTION TO APPROVE SETTLEMENT

This is a Motion by the Chapter 7 Trustee to settle potential fraudulent conveyance cases against Debtors' two children to whom Debtors in 2009 conveyed two residences - one in Michigan and one in Florida. The parties stipulated to many of the facts as well as a number of exhibits. The Trustee and her attorney testified at the hearing and the stipulated facts, their testimony, and the exhibits constitute the evidentiary basis for the Court's ruling.

The stipulated facts are as follows:

1. On July 7, 2011 (the "Petition Date"), Paul Emerson McCauley and Janine Marie McCauley (the "Debtors") filed a voluntary petition under Chapter 7 of the U.S. Bankruptcy Code (the "Code").

2. Wendy Turner Lewis is the duly appointed, qualified, and acting Chapter 7 Trustee of the Debtors' estate (the "Trustee").

3. Prior to May 11, 2009, the Debtors owned certain real property located in Hernando County Florida, described as: Lot 431, Glen Lakes Phase One, Unit Two A, according to the plat thereof, as recorded in Plat Book 26, Pages 14-17, Public Records of Hernando County Florida. The East 25 ft of Lot 431 & the West 60 ft of Lot 430. Commonly known as 8380 Bethany Lane, Brockville, FL, Tax Parcel No. R14-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-0000-0431 (the "Florida Property").

4. On or about May 11, 2009, the Debtors transferred their interest in the Florida Property jointly to their children, Caitlin M. McCauley and Ryan J. McCauley (collectively, "Caitlin and Ryan"), via Quit Claim Deed, for the stated consideration of $1.00, which was recorded in Hernando County, Florida records on May 22, 2009 (the "Florida Transfer").

1

5. Although there appear to be no mortgages that currently encumber the Florida Property, there are property taxes totaling at least $11,886.63, which were due to be sold at tax deed sale on or about November 5, 2012.

6. The Trustee filed her Motion for Order Holding the Hernando County Tax Collector in Contempt of Court for Violation of Automatic Stay on August 8, 2012 (Docket No. 76), to halt the tax deed sale.

7. On September 21, 2012, the Order entered the Order Resolving Motion for Order Holding the Hernando County Tax Collector in Contempt of Court for Violation of Automatic Stay (Docket No. 90), which commanded the Hernando County Tax Collector to immediately cease all present tax deed sales and forfeiture proceedings and prevented it from commencing any future tax deed sales or forfeiture proceedings concerning the Florida Property, unless otherwise directed by this Court.

8. On or about August 22, 2008, Debtor Janine Marie McCauley, solely, purchased residential real property commonly known as 15511 18 Mile Road, Clinton Township, Michigan, Tax Parcel No. 11-07-351-004, for $149,900.00 (the "Michigan Property"). The Deed to the Michigan Property was recorded in Macomb County, Michigan records on October 16. 2008.

9. On or about May 11, 2009, Debtor Janine Marie McCauley transferred her interest in the Michigan Property jointly to Caitlin and Ryan, via Quit Claim Deed, for the stated consideration of $1.00, which was recorded in Macomb County, Michigan records on June 11, 2009 (the "Michigan Transfer").

10. The Florida Transfer and the Michigan Transfer shall be collectively referred to in this Stipulation as the "Transfers".

11. At the time of the Transfers, the Debtors were defendants in a lawsuit brought by Forristall, which was pending in the U.S. District Court for the Southern District of Texas (the "Forristall Lawsuit").

12. Forristall alleged in the Forristall Lawsuit that the Debtors owed them a substantial amount of money based on causes of action arising from knowing and intentional misrepresentation of a vehicle sold by the Debtors to Forristall.

13. In January 2009, the Debtors' attorney withdrew from the Forristall Lawsuit.

14. After the Transfers occurred, the Debtors ceased defending the Forristall Lawsuit.

15. On November 5, 2009, Forristall obtained a default judgment against the Debtors in the Forristall Lawsuit in the amount of $385,722.11.

16. The Trustee and Forristall agree that the following "badges of fraud" exist under M.C.L. 566.34(2) concerning the Transfers:

    a. The Transfers were to insiders of the Debtors.
    b. The Debtors retained possession or control of the Florida Property and the Michigan Property after the Transfers occurred.
    c. Before the Transfers were made, Forristall had sued the Debtors.

17. The Trustee and Forristall believe that the Transfers constitute fraudulent transfers that the Trustee may avoid under Code §544(b) and the Michigan Fraudulent Transfer Act, M.C.L. §566.31, *et seq.*, and recover pursuant to Code § 550.

18. Caitlin and Ryan have advised the Trustee of the following alleged defenses and have provided the Trustee with certain documentation they claim support their defenses:

    a. On January 26, 2007, the Debtors' former residence, as well as the contents, was damaged by fire.

    b. The insurance proceeds for the personal property of Caitlin M. McCauley that was damaged or destroyed in the fire totaled $93,376.00, and the insurance proceeds for the personal property of Ryan M. McCauley that was damaged or destroyed in the fire totaled $97,189.00.

    c. However, the Debtors spent all of these proceeds on other items, except for approximately $20,000.00 that was given to Caitlin M. McCauley, and approximately $20,000.00 that was given to Ryan M. McCauley, to replace their damaged/destroyed personal property.

    d. In 1998, the Debtors purchased annuity contracts for Caitlin and Ryan, individually (the "Annuities").

    e. On September 8, 2008, the Debtors liquidated the Annuities for the purpose of acquiring the Michigan Property.

    f. At that time, Ryan M. McCauley's annuity totaled $28,187.14, and Caitlin M. McCauley's totaled $27,368.30.

    g. Caitlin M. McCauley also withdrew approximately $18,000.00 from her bank account to contribute funds for the purchase of the Michigan Property.

    h. Thus, Caitlin and Ryan allege that as of the date of the Transfers, they were collectively owed the sum of approximately $224,000.00 from the Debtors, which they claim represents reasonable equivalent value for

the Transfers.

    i. Finally, Caitlin and Ryan allege that the Transfers were made in good faith, so that even if the Trustee avoided the Transfers, they would be entitled to a credit for the amount owing to them at the time of the Transfers.

Foristall, the objecting creditor, holds a judgment against Debtors for some $340,000.00.

The settlement essentially proposes that (a) the Florida property owned by the children, which is free and clear except for delinquent taxes, will be conveyed to, and will later be liquidated by, the Trustee who will in the process pay taxes and other costs, netting by her estimate of its value, some $133,175.00 for unsecured creditors; (b) the Debtors' children who apparently now own the Michigan property (which is now occupied by the Debtors and one child) will retain such ownership free and clear of any claim by the Trustee; and (c) execution of appropriate mutual releases.

The criteria to be considered and applied in settlement approval situations, weighed in a manner chosen by the Court, are:

    (1.) The balance between the likelihood of the Plaintiff's or Defendant's success should the case go to trial compared to the present and future benefits offered by the settlement;

    (2.) The prospect of complex, costly, and protracted litigation if the settlement is not approved;

    (3.) The proportion of class members who do not object or who affirmatively support the proposed settlement;

    (4.) The competency and experience of counsel who support the settlement;

    (5.) The relative benefits to be received by individuals or groups within the class;

    (6.) The nature and breadth of releases to be obtained by officers and directors;

(7.) The extent to which the settlement is the product of arm's length bargaining (i.e., whether or not the agreement was reached between insiders without creditor participation).

Applying such to the facts in this situation the Court concludes as follows:

As to the likelihood of success if the case goes to trial, the Court believes there is a good likelihood of success, given the nature of the transaction, the relationship of the recipients to the Debtors, the timing of the transactions, etc. - there being substantial badges of fraud as well as the likelihood that the Debtors were insolvent at the time of the transfers. Exhibit N showing the results to the unsecured creditors of the settlement versus the results if the Trustee successfully goes to trial and wins the case obtaining back both properties for the estate, is a reasonably accurate version of the proofs and facts shown.

There is a real prospect of costly and protracted litigation if the settlement is not approved and the costs of such as estimated in Exhibit N are reasonable, i.e.; some $40,000.00.

As noted, one unsecured though substantial at about $340,000.00 creditor, opposes the settlement; some 18 unsecured creditors claiming a total of some $3,600,000.00 have timely filed claims;

Counsel who represent the Trustee in supporting the settlement are experienced and competent.

The relative benefits to be received by the various unsecured creditors are set forth in Exhibit N which in summary shows that if the settlement is approved it is likely the unsecured creditors will divide up $133,176.00 and thus receive 3.66% of their claims; whereas if the settlement is not approved and if the Trustee is completely successful at trial and any appeal, those

unsecured creditors will divide up $188,552.00 and thus receive 5.18% of their claims. In terms of the objecting creditors own claim the dollar receipt figures will be the difference between $14,191.00 and $20,093.00.

As to any releases, the primary one mentioned is a release of the Debtors with respect to the transactions which are the subject of the fraudulent claim plus possibly a release with respect to a $10,000.00 wedding gift to the daughter on the eve of bankruptcy.

The settlement appears to have been the result of the facts initially being brought to the attention of the Trustee primarily by the objecting creditor, as well as the Trustee's own inquiries, as well as direct negotiations between the Trustee and the attorneys for Debtors and their children, the potential defendants.

The defenses asserted by or on behalf of the children, arise from the following alleged facts: (a) Some two years before the conveyances to them, there was a fire in their previous home which was insured under a policy on which they directly or indirectly were insured parties; (b) Some of the losses were of items ownership of which was claimed or attributed to the children who were then living with Debtors and then in, or barely out of, high school; (c) While the children apparently received some $20,000.00 each for such items on the theory they in fact owned such items which were located in their rooms and included fairly expensive furniture, etc., they claim they were really owed, and their actual losses were much greater than that; (d) Some annuities in the names of the children but previously purchased by the Debtors, were appropriated by the Debtors and used by them to purchase their current home. The foregoing is what constitutes the alleged consideration for the transfers or value set offs which the children argue they would be entitled to assert as a

6

defense to an otherwise meritorious fraudulent conveyance claim, and, which the Trustee stated she took into account in entering into the proposed settlement.

Evaluating the merits of those defenses and asserted consideration claims, necessarily based on the limited evidence before the Court and appropriate to settlement approval proceedings, it must be said that in this apparently not atypical family situation, the children's claims of ownership of the various items noted involved in the insurance settlement, and what appears to be the substantially inflated values attributed to them, strains credulity.  Morevover, one comes away with the distinct impression one result of approving the settlement, measured at least by general concepts of right and wrong, would essentially be allowing Debtors and their children to reap a benefit that under other circumstances would be considered quite inappropriate.

That said, however, right or wrong are not the applicable criteria.  Rather the criteria are those set forth in the case of *In re Dow Corning*, 192 B.R. 415 (Bankr.1996) E.D. Mich. at 421 ___, where the Court correctly opined:

> A proposed settlement should only be approved by the bankruptcy judge upon a determination that the settlement is "fair and equitable."  *TMT Trailer*, 390 U.S. at 424, 88 S.Ct. at 1163.  When considering whether to approve a proposed settlement, "the bankruptcy court is charged with an affirmative obligation to apprise itself of the underlying facts and to make an independent judgment as to whether the compromise is fair and equitable.  The court is not permitted to act as a mere rubber stamp or to rely on the trustee's word that the compromise is reasonable."  *Reasonable v. Commissioner of Internal Revenue,* 861 F.2d 469, 473 (6th Cir. 1988) (citing *In re American Reserve Corp.*, 841 F.2d, 159, 162-63 (7th Cir.1987)).  However, the court need not conduct a "mini-trial on the merits of the settlement."  *Drexel Burnham Lambert,* 134 R.B. at 496; *In re Energy Co-op., Inc.*, 886 F.2d 921, 927 n. 6 (7th Cir. 1989).  Instead, the obligation of the court is to "canvas the issues and see whether the settlement 'falls below the lowest point in the range of reasonableness.'" *Drexel Burnham Lambert*, 134 B.R. at 497 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir.1983), *cert. Denied, Cosoff v. Rodman*, 464 U.S. 822, 104 S.Ct. 89, 78 L.Ed.2d 97 (1983)).

Using this standard, the Court is constrained to conclude this settlement does not fall below the lowest range of reasonsableness. The noted differences in results between the proposed settlement and that which might be obtained, if and only if, the Trustee prevails in litigation and everything goes perfectly and completely her way, are simply not substantial enough to require the Trustee to embark on and pursue that litigation to its very end. It is the rare case where in fact litigation goes perfectly. In the practical Chapter 7 world, the Trustees obligation to timely liquidate assets and distribute the proceeds to the creditors requires a measure of judicial deference to a Trustee's decision to settle controversies which is designed to, or achieves or that end, and to timely obtain the best practical results attainable for all creditors not just the objecting one(s). Therefore, and somewhat reluctantly, but correctly, this is one of those situations where approval of the settlement proposal should be granted, and the Court does so.

The Court's approval of the Settlement is, however, conditioned on an appropriate agreed upon amendment to the proposed Settlement Agreement - the intent of which is just to make sure the Trustee fully and ultimately receives what she has bargained for, and which the Court believes in any event is inherent in the Settlement Proposal but needs to be clarified in its final documentation. That amendment must provide that (a) the conveyance(s) to the Trustee of the Florida Property shall be by way of a warranty, rather than a quit claim deed, conveying marketable title, accompanied by the concurrent furnishing to the Trustee of an appropriate title insurance policy paid for by the transferors subject only to restrictions of record and the real estate taxes detailed in Exhibit N; (the intent being that the Trustee, subject to applicable provisions of the Bankruptcy Code relating to sales of property must be able to dispose of the property free and clear of any claims, and any further actions on the part of both McCauley and the Debtors or any predecessor(s) in interest);

8

and (b) immediate execution and recordation of appropriate recordable injunctions and restrictions covering both the Michigan and Florida properties prohibiting any further encumbrance, assignment, or alienation of either of the properties pending consummation of a sale by the Trustee of the Florida Property: the same to terminate upon consummation of the sale. If these conditions are not agreed upon and fully effectuated by the parties, approval of the settlement is denied.

    The Trustee shall present an appropriate order.

**Signed on January 30, 2013**

                                    **/s/ Walter Shapero**
                              **Walter Shapero**
                              **United States Bankruptcy Judge**